The Honorable Benjamin H. Settle

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                  Plaintiff,<br><br>    v.<br><br>ASHTON CONNOR GARCIA,<br><br>                  Defendant. | NO. CR23-5090 BHS<br><br>**UNITED STATES' SENTENCING MEMORANDUM**<br><br>Sentencing:  June 4, 2024 at 9:30 a.m. |

Ashton Garcia intentionally terrorized people and frivolously squandered scarce emergency resources for his own amusement. When law enforcement officers confronted him on the phone and explained the harm he was causing, he taunted them and boasted that he would never be caught. And this was not a single, isolated event. It was a repetitive pattern that escalated for months, affecting dozens of people. Even when this Court gave Garcia a chance, after his federal indictment, to show genuine remorse and rehabilitation on pretrial release, Garcia squandered that opportunity by committing more of the same harassing behavior.

United States' Sentencing Memorandum - 1
*United States v. Garcia*, CR32-5090 BHS

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Three aggravating aspects of Garcia's conduct stand out as considerations for sentencing. First, Garcia committed the same crimes over and over again, and his crimes had broad national scope. Second, Garcia knew he was hurting other people and this fact did not dissuade him; it delighted him. Terrorizing other people was not merely incidental to his criminal behavior, but rather *the entire point* of his criminal behavior. And third, he arrogantly and callously taunted the responding law enforcement officers whose lives he had just endangered and whose time and effort he had just wasted.

Considering the seriousness of Garcia's offenses, as well as the need to promote respect for the law, provide just punishment for these offenses, and deter Garcia and others from continuing to engage in this predatory and reckless behavior, the government asks the Court to impose a sentence of 48 months in custody, to be followed by three years of supervised release.

## I.   FACTUAL BACKGROUND

### a. Garcia's pattern of harassment.

Garcia regularly called emergency dispatchers throughout the country to report fake emergencies. He intentionally cultivated a sense of danger and urgency on these calls by pretending to sound scared and distressed, sometimes crying or whispering for added effect. He used certain language to escalate the law enforcement response, often telling dispatchers that someone was dead or fatally injured, someone else was being held hostage or hiding in fear, and that the perpetrator had access to deadly weapons like knives, guns, and explosives.

Garcia's goal was to trick dispatchers into sending armed law enforcement officers into his targets' homes, which is a malicious practice often referred to as "swatting." He intentionally set up situations in which law enforcement officers erroneously believed they were responding to a violent crime in progress, and unsuspecting victims experienced the trauma and shock of a home invasion or arrest. For example, in

United States' Sentencing Memorandum - 2
*United States v. Garcia*, CR32-5090 BHS

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Edmonton, Alberta, an 8-year-old boy and his mother were woken up in the night by a team of law enforcement officers with rifles. 20 officers and 7 civilian staff members were directly involved in that law enforcement response. In New Jersey, a man was removed from his house and detained at gunpoint, and an elementary school was locked down on the first day of school. Over 19 officers responded to the area, along with several officers from a neighboring police agency. In Colorado, a family was traumatized when officers suddenly broke down their front door to rescue a woman whom they believed was bleeding to death on the floor. At least 9 police units were dispatched to that incident.

During the height of his crime spree in the summer of 2022, Garcia often made several hoax calls per week and sometimes made multiple calls in a single day. He treated swatting like a form of entertainment in which he was the star performer. He set up Internet chatrooms devoted to swatting, and he invited people to come watch his swatting calls, as if it were a premier sporting event. He livestreamed the calls on the Internet and posted at least one of the video recordings on YouTube. *See* Ex. 1 (Screenshot of Swatting Call Video).

Garcia targeted victims for a variety of different reasons. He targeted people he met in online chatrooms. He targeted people his friends asked him to swat. He targeted people at random after finding their publicly available information online. He may have targeted people based on their race, gender identity, and sexual orientation. After one swat, he told an associate, "I swatted a faggot," and on another occasion, he bragged about how he "swatted a nigger."

Sometimes Garcia was still on the phone when law enforcement realized his call was a hoax. During those instances, Garcia laughed and taunted the responding officers. He told them how fun it was to make the hoax calls and bragged that they would never

United States' Sentencing Memorandum - 3
*United States v. Garcia*, CR32-5090 BHS

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

find him because of the steps he had taken to hide his identity. In one Internet chat, Garcia stated, "Im literally terrorizing cops these days . . . They can't catch me."

Garcia knew that he was committing crimes and hurting people, and he loved it. Records obtained from Garcia's social media accounts include numerous chats in which Garcia talked about how much he enjoyed swatting and extortion and why he was too clever to be caught.  For example, when an online associate asked what swatting was, Garcia explained: "Swatting is / Calling the cops and saying you have a hostage or there's a bomb or something very serious and sending them to someone's house / I said my dad has hand grenades and is raping my mom and holding us hostage with a gun send help to this address."  The associate responded, "why u be doing that then / u don't wanna be stuck in a jail." Garcia said, "Ik [I know] I won't be caught . . . They can't catch me / It would take millions to find me." He also described the various technological steps he took to prevent law enforcement from tracing the calls and identifying him.

Garcia's online conversations also revealed his awareness of the harm he caused and his enthusiasm for preying on other people. He tried to form a group that would focus on doxxing, swatting, and extortion. In his own words, the group's mission was "to terrorize people." He *repeatedly* commented that "Extortion is fun" and talked about making other people's lives "miserable." He bragged that he had become a "cyber terrorist."

b.  **Garcia harassed dozens of people in at least 13 different states.**

Between June and September 2022, Garcia harassed an alarming number of victims and law enforcement agencies. The FBI identified at least 20 hoax calls that Garcia made to police agencies in Ohio, Illinois, Minnesota, California, Kentucky, Pennsylvania, California, Alberta (Canada), Washington, Georgia, Michigan, Tennessee, and New Jersey during that three-month period.

United States' Sentencing Memorandum - 4
*United States v. Garcia*, CR32-5090 BHS

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

*June and July*

Beginning in early June 2022, Garcia targeted a transgender woman whom he believed resided at an address in Minnesota. His first call falsely used the victim's name and falsely claimed that he shot his mother and father. At least 12 sheriff's deputies, three 911 dispatchers, a multijurisdictional Special Weapons and Tactics (SWAT) team, and a neighboring police department responded to the call. They were occupied by this call for nearly two hours and unavailable for other calls during that time.

Garcia boasted about this activity, including by telling an associate: "I swatted a faggot." Over the next two months, he made two more swatting calls targeting that address and extorted the victim's father for $150.00. He continued to use the victim's name as an alias when he placed other swatting calls.

Beginning in mid-July, Garcia targeted VICTIM-1, a 12-year-old girl residing in Ohio. He threatened to swat her if she did not send him her parents' credit card information. Other online associates tried to dissuade Garcia (A1FA#9375) from targeting a 12-year-old, but he ignored their advice:

| | | |
|---|---|---|
| **ID 1:** | | *Bro we're swatting her* |
| **ID 2:** | | *no* |
| **A1FA#9375:** | | *Yes we're swatting* |
| **ID 2:** | | *were not*<br>*the fuck*<br>*shes 12* |
| **ID 3:** | | *She's fucking 12* |
| **A1FA#9375:** | | *Yes we are* |
| **ID 1:** | | *we're swatting* |
| **A1FA#9375:** | | *We'll do it when she's at school* |

[ . . . ]

United States' Sentencing Memorandum - 5
*United States v. Garcia*, CR32-5090 BHS

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

| | | |
|---|---|---|
| **A1FA#9375:** | | lets get her to send pictures of all her parents credit card info<br>"or we swat"<br>After we get it<br>swat |

After unsuccessfully extorting VICTIM-1 for her parent's credit card information, Garcia made a swatting call that sent an armed police response to VICTIM-1's house while she was home alone. Garcia was still on the phone with a responding officer when the police realized the call was a hoax. Garcia laughed and told the officer that no one could trace the call and it was "fucking hilarious." In his online chats after the incident, Garcia laughed how traumatic the experience was for VICTIM-1, bragged about taunting the responding law enforcement officers, continued to boast about how he was too technologically savvy to be caught, and wrote: "I hate niggers / swatted a nigger last night." (VICTIM-1 and her family are Black.)  In the following days, he made two more swatting calls targeting VICTIM-1 and her family.

Between July 25 and July 30, Garcia made at least six more calls, including the following.

On July 25, he called Charleston, Illinois, to falsely claim that he planted a bomb at a park near a local university.

On July 28, he called in a bomb threat to the Cleveland Police Department because he was "bored." A bomb squad evacuated and cleared the targeted building. While he was on the phone with a police officer, Garcia searched the Internet for the officer's personal identifying information, such as her full name and home address, and then read that information back to her while she was on the phone with him.

Also on July 28, Garcia called Peoria, Illinois, to falsely report that his stepfather was holding a gun to his mother's head and raping her.

United States' Sentencing Memorandum - 6
United States v. Garcia, CR32-5090 BHS

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

On July 29, he called the Los Angeles Police Department to falsely report that his father was raping his sister with a gun, had a lot of guns, suffered from schizophrenia, and was addicted to PCP.

And on July 30, he called Pikeville, Kentucky to falsely claim that he was holding two people hostage with a pipe bomb and an AR-15, and threatened to kill the hostages unless he received $50,000 cash.

### *August and September*

In mid-August, Garcia told an associate that he "got a new egirl" (meaning an online girlfriend) and "she's a minor." From context, these comments likely refer to VICTIM-2, a New Jersey resident who was 14 years old at the time and began an online relationship with Garcia in mid-August 2022. In late August, Garcia demanded that VICTIM-2 cut his "fansign" into her body. He told her: "i own you," and "you don't want the consequences of saying no." When she stopped responding to his messages, he demanded: "play with your tits" on camera or "get swatted and terrorized for what will seem like an eternity." He followed through on these threats by swatting VICTIM-2 and her family, as set forth in greater detail below.

On August 22, Garcia swatted a popular YouTube streamer by calling a police agency in Pennsylvania to falsely claim that his father had stabbed his mother.

The following day, August 23, Garcia called the Los Angeles Police Department to falsely claim that "his daughter" told him there was a bomb on her flight from Honolulu to Los Angeles.

On August 27, Garcia swatted an address in Edmonton, Alberta, Canada, by falsely reporting that he shot his mother, that she was bleeding to death on the floor, and that he would shoot police if they entered the home. An emergency dispatcher gave Garcia step-by-step instructions on how to do CPR to save his "dying mother," while Garcia facilitated the hoax by pretending to do CPR for approximately 30 minutes.

United States' Sentencing Memorandum - 7
*United States v. Garcia*, CR32-5090 BHS

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Meanwhile, at the targeted address, an 8-year-old boy and his mother were woken up by a team of Tactical officers with rifles and shields. In a signed witness statement, the female victim wrote that the incident "[l]eft my son and I very scared and confused most of all traumatized and my son is getting counseling over the event."

Twenty police officers responded to the Edmonton incident, encompassing *all* on duty police officers and *all* on duty Tactical members in the West Division of the Edmonton Police Service. Those officers were not available to respond to legitimate emergencies because they were occupied on that call. Additionally, an Emergency Medical Service (EMS) unit of paramedics unnecessarily staged at that call for two hours, waiting to provide lifesaving medical assistance.

After the swatting call, Garcia called the Edmonton Police Service a second time to taunt them. He said, "That was a hoax. That shit was funny as hell." He said he wanted to know how many police officers responded to the house. The dispatcher told Garcia that he was making terroristic threats, and he said, "You're right, I *am* a fucking terrorist." Then he threatened to bomb the police station and ended the call by telling the dispatcher, "Fuck you, you stupid bitch."

The following day, August 29, Garcia swatted his neighbor in Bremerton "for shits and giggles." He falsely reported that he shot his mother, and she was barely breathing. After law enforcement officers responded to the house and realized the call was a hoax, Garcia laughed, told the dispatcher that he could not be charged with a crime because he lived in Canada, and said it was a funny joke. In an online conversation, he told an associate that he enjoyed watching the armed response from his bedroom window and described the incident as "thrilling."

A few days later, on September 2, 2022, Garcia made hoax calls to law enforcement agencies in Michigan and Tennessee. In the calls, he falsely claimed that his father was holding him hostage with a gun and a bomb. In his online chats that day,

United States' Sentencing Memorandum - 8
*United States v. Garcia*, CR32-5090 BHS

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Garcia bragged that there were a lot of officers "outside the gay guys house thinking that theres an individual being held hostage with a bunch of guns and a bomb."

On September 6, 2022, Garcia made at least three more calls.

First, Garcia made good on his threat and swatted VICTIM-2's home in New Jersey. He falsely reported that his father stabbed his mother, that his mother was dying on the kitchen floor, and that his father was walking around the house with a shotgun or rifle while he and his sister hid under a bed. Due to the serious nature of the call, the police department responded to the area with 19 officers (including the Chief of Police, Lieutenants, Sergeants, Detectives, and Patrol) and detained the sole occupant of the home at gunpoint. The officers also performed a house-to-house check in the neighborhood and placed a nearby elementary school on lockdown. The elementary school students had to be diverted to other locations on their first day of school.

That same day, Garcia called in another bomb threat to the Los Angeles Police Department, this time falsely claiming that he had placed explosives at a Los Angeles airport and wasting the resources of two police units and a sergeant. And he placed another hoax call to the Bremerton Police Department.

On September 8, 2022, a Pennsylvania detective identified Garcia as the perpetrator of an August swatting call. The detective called Garcia's house and spoke to Garcia's mother and father. A few days later, the detective spoke to Garcia himself. Garcia admitted that he made the call and claimed that he was remorseful for it. Shortly thereafter, Garcia told an associate that he would take a break for a few months and "When I vome bsck [sic] were making this detectiv[e's] life a living hell." Charges were filed in Pennsylvania and a non-extraditable warrant was issued. The detective called Garcia's parents to tell them about the charges and the warrant.

United States' Sentencing Memorandum - 9
United States v. Garcia, CR32-5090 BHS

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

*January*

Ultimately, neither the criminal charges in Pennsylvania nor Garcia's conversation with the detective deterred Garcia from resuming his swatting campaign. In late January 2023, Garcia swatted an apartment unit in Castle Rock, Colorado. Because Garcia provided false information that he shot his girlfriend, she was bleeding out, and he refused to provide aid, armed officers forced entry into the apartment with a battering ram. The occupants were a man, woman, and their infant child. The woman was a former teacher who had survived a school shooting two years early, and law enforcement described her response to the armed forced entry as "traumatized, hysterical, and terrified."

### c. Even after indictment, Garcia violated pretrial release by harassing people.

Garcia was indicted and arrested in late March 2023 and released from federal custody in August 2023. His brief period of pretrial supervision did not go well. He repeatedly used controlled substances and alcohol, refused to do a substance abuse assessment, and was unable to maintain employment. In November 2023, he walked into a retail store (where he had previously been employed) wearing a ski mask, brandishing a replica handgun, and rapping a song about killing people. Then Garcia pointed the replica firearm at a customer as he walked out of the store. He was arrested and convicted of misdemeanor harassment. After resolving his state case, Garcia returned to federal custody and his bond was revoked.

## II.   THE PLEA AGREEMENT

Garcia has pleaded guilty to two counts of making hoax bomb threats (Counts 2 and 3) and two counts of extortion (Counts 1 and 7).

The parties agree that the facts in Paragraph 8 of the Plea Agreement establish commission of the offenses charged in Counts 1-10 for purposes of calculating the

United States' Sentencing Memorandum - 10
*United States v. Garcia*, CR32-5090 BHS

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Sentencing Guidelines. *See* U.S.S.G. § 1B1.2(c) ("A plea agreement (written or made orally on the record) containing a stipulation that specifically establishes the commission of additional offense(s) shall be treated as if the defendant had been convicted of additional count(s) charging those offense(s).").

Two jurisdictions referenced in Paragraph 8: Newtown Township, Pennsylvania, and Castle Rock, Colorado, have agreed to dismiss their criminal charges in favor of a global resolution in this Court. Similarly, the other jurisdictions referenced in Paragraph 8 of the Plea Agreement have agreed not to file charges in their respective jurisdictions, thereby permitting those potential charges to be resolved by the proceedings in this Court.

The Plea Agreement also provides for restitution; however, none of the victims in this case are seeking a restitution order.

### III.   SENTENCING FACTORS

Garcia has a criminal history category of I. The government agrees with Probation's calculation of the Sentencing Guidelines, as set forth in paragraphs 29-101. These calculations result in a Total Offense Level of 22, and Sentencing Guidelines range of 41 months to 51 months. PSR ¶¶ 101, 136.

### IV.   GOVERNMENT'S RECOMMENDATION

Garcia's crime spree was motivated by malice, lack of empathy, arrogance, and his desire for attention and status. Those are terrible reasons to place so many people's lives and mental health at risk. Justice demands a serious punishment when someone hurts other people for fun. There should be serious consequences for repeatedly and intentionally terrorizing people, risking people's lives, tying up emergency resources, taunting law enforcement, and persisting in criminal conduct despite numerous interventions. Accordingly, the government asks the Court to sentence Garcia to 48 months in custody, followed by a three-year term of supervised release under the conditions recommended by Probation.

United States' Sentencing Memorandum - 11
*United States v. Garcia*, CR32-5090 BHS

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Garcia's crimes are very serious. Every hoax call he made was a gamble that risked someone being injured or killed. A resident could shoot a police officer, mistakenly believing that the officer was a criminal invading his or her home. A police officer could shoot the resident, mistakenly believing that the resident was a violent armed criminal. Or police officers could crash their vehicles while racing to the scene of what they mistakenly believed was a life-or-death emergency. These are real and catastrophic risks.

The fact that no one was seriously injured or killed during Garcia's harassment campaign was just a lucky roll of the dice. And even though his victims escaped physical injury, many of them suffered mental and emotional trauma. Garcia's conduct had a particularly harmful impact on child victims and their parents. Yet Garcia persisted in his cyberterrorism for *months*, exhibiting absolutely no concern for the safety or wellbeing of other people. To make matters even worse, Garcia literally *laughed* about the harm he caused and actually tried to *profit* from that harm by extorting victims.

The fact that Garcia committed yet another harassment crime on pretrial release is another aggravating factor. It is deeply troubling that Garcia continued to harass people even after he was charged in state and federal court, and even after this Court gave him an opportunity to rehabilitate himself and make better choices. The fact that numerous interventions were not enough to stop Garcia's harassing behavior is further evidence that a significant sentence is warranted.

Finally, this case presents the Court with an important opportunity to recognize the harms of online harassment, to promote respect for the law, and to send a message of specific and general deterrence. Swatting, threats, and other forms of online harassment have proliferated nationwide in part because many perpetrators believe, as Garcia did, that extortion is "fun," that swatting is "hilarious," and modern technology makes them invisible and invincible. Enforcement in a case like this one helps deter similar conduct

United States' Sentencing Memorandum - 12
*United States v. Garcia*, CR32-5090 BHS

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

by emphasizing that online harassment is not a form of entertainment, but rather a serious federal crime, and by increasing the perception that individuals who threaten, harass, and extort other people will be caught and punished. Considering the prolific nature of Garcia's conduct, its national scope, his callousness and malice, his leadership role, and the reverberating harms he caused to the community, his crimes must receive a significant sentence so that he and others understand that this dangerous conduct will not be tolerated.

## V. CONCLUSION

For the foregoing reasons, the government asks the Court to impose a sentence of 48 months in custody for Counts 2 and 3, followed by three years of supervised release. As to Counts 1 and 7, the government asks the Court to impose a sentence of 24 months (the statutory maximum for those offenses), concurrent to Counts 2 and 3, with no supervision to follow.

DATED this 28th day of May, 2024.

Respectfully submitted,

TESSA M. GORMAN
United States Attorney

*s/ Jessica M. Manca*
JESSICA M. MANCA
Assistant United States Attorney
United States Attorney's Office

United States' Sentencing Memorandum - 13
*United States v. Garcia*, CR32-5090 BHS

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970